*Prepared and Proposed By:*

MICHAEL L. LARSEN (4069)
WILLIAM J. EVANS (5276)
KELI BEARD (10628)
Parsons Behle & Latimer
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, UT  84145-0898
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
E-mail:mlarsen@parsonsbehle.com
        bevans@parsonsbehle.com
        kbeard@parsonsbehle.com

THEODORE A. LIVINGSTON, JR.
KARA K. GIBNEY
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
T: (312) 782 0600
F: (312) 701 7711
E-mail: tlivingston@mayerbrown.com
        kgibney@mayerbrown.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| AT&T CORP., | **MEMORANDUM OPINION AND ORDER ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT AND AT&T CORP.'S MOTION FOR RECONSIDERATION OF THE COURT'S DECISION DENYING LEAVE TO AMEND** |
| Plaintiff, | |
| vs. | |
| BEEHIVE TELEPHONE COMPANY, INC., | Case No. 2:08CV941 |
| Defendant. | Judge Bruce S. Jenkins |

4838-5290-3941.1

The following matters came before the Court:

1.      Plaintiff AT&T Corp.'s ("AT&T") Motion for Summary Judgment (Dkt. No. 34);

2.      Defendant Beehive Telephone Company, Inc.'s ("Beehive Telephone") Motion for Summary Judgment (Dkt. No. 38); and

3.      AT&T's Motion for Reconsideration of the Court's Decision Denying AT&T's Motion for Leave to File Its Second Amended Complaint (Dkt. No. 40).

The Court heard oral argument on these motions on November 16, 2009.  AT&T was represented by Ted Livingston of Mayer Brown LLP and William Evans of Parsons Behle & Latimer.  Beehive Telephone was represented by Alan Smith and David Irvine.  Having considered the parties' briefs and the arguments of counsel at the hearing on November 16, 2009, the Court disposes of these motions as follows:

1.      The Court grants AT&T's motion for summary judgment in its entirety.

2.      The Court denies Beehive Telephone's motion for summary judgment.

3.      The Court denies as moot AT&T's motion for reconsideration.

The Court now enters the following Memorandum Opinion and Order.

## BACKGROUND

This is an action by AT&T to recover alleged overcharges related to interstate access services provided by Beehive Telephone and its sister company, Beehive Telephone Company, Inc. Nevada ("Beehive Nevada").  AT&T claims that the federal switched access tariff shared by Beehive Telephone and Beehive Nevada permits Beehive Telephone and Beehive Nevada to charge for only one Tandem Switched Termination ("TST"), at the end office, per access minute; that Beehive Telephone and Beehive Nevada nevertheless charged AT&T for three TSTs per

1

access minute on the vast majority of AT&T calls, one TST charge at the end office and two

TST charges at the intermediate tandem owned by Beehive Telephone; that the two TST charges

at the intermediate tandem were unauthorized by the tariff and therefore unlawful and constituted

overcharges; and that AT&T is entitled to recover the aggregate amount of the two TSTs charged

at the Beehive Telephone tandem, plus penalty interest at the rate specified in the Beehive

Telephone/Beehive Nevada tariff.

AT&T filed its original Complaint on December 5, 2008 (Dkt. No. 2), asserting three

theories of recovery:  Violation of the federal tariff (Count I); violation of 47 U.S.C. § 201(b)

(which prohibits "unjust and unreasonable" practices) (Count II); and unjust enrichment

(Count III).  AT&T filed its Amended Complaint on May 1, 2009 (Dkt. No. 19).  The Amended

Complaint changed the aggregate amount of the overcharge claim, but was in all other respects

identical to the original complaint.  AT&T moved for summary judgment on all three counts.

AT&T moved for leave to file a second amended complaint adding Beehive Nevada as a

party defendant on June 26, 2009 (Dkt. No. 20).  The Court denied that motion in open court at

the hearing held on that motion on August 7, 2009.  AT&T moved for reconsideration of the

denial on October 6, 2009 (Dkt. No. 40).

Beehive Telephone asserts in its motion for summary judgment that its tariff authorized

the TST charges at issue and that in any event it is shielded from refund liability by virtue of 47

U.S.C. § 204(a)(3).

2

## UNDISPUTED MATERIAL FACTS

The Court finds that the following material facts are undisputed:[1]

1.       Beehive Telephone and Beehive Nevada (collectively the "Beehive Companies") are incumbent local exchange carriers.  Beehive Telephone's customers are located in Utah, and Beehive Nevada's customers are located in Nevada.  Amended Complaint, ¶ 6; Answer, ¶ 4; Response of Beehive Telephone to Motion of AT&T for Leave To File Second Amended Complaint (Dkt. No. 22) at 4, 7.

2.       AT&T is a long distance, or interexchange, carrier.  *Id.*

3.       Throughout the period at issue in this case, Beehive Telephone and Beehive Nevada provided interstate access services to AT&T.  That is, they used their networks (1) to terminate to their end user customers interstate long distance calls carried to them by AT&T and (2) to carry to AT&T interstate long distance calls originated by their end user customers.  *Id.* The large majority of these access services involved terminating AT&T long distance traffic.  A small percentage involved originating AT&T long distance traffic.  AT&T Ex. 1, Deposition of James Charles McCown[2] ("McCown Dep.") at 11-12.[3]

---

[1] With respect to each of the following facts, Beehive Telephone either does not dispute it at all or disputes only that it is material.

[2] Mr. McCown is the Chief Operating Officer of both Beehive Telephone and Beehive Nevada.  McCown Dep. at 4-5.

[3] AT&T and Beehive Telephone submitted briefs and sets or appendices of exhibits in connection with their cross motions for summary judgment.  In this Memorandum Opinion and Order, AT&T's memorandum in support of its motion for summary judgment (Dkt. No. 35) is referred to as "AT&T's Br." and its exhibits as "AT&T Ex." or "AT&T Exhibit"; Beehive Telephone's opposition (Dkt. No. 43) is referred to as "Beehive Opp. Br." and its exhibits as "Beehive Opp. Ex."; AT&T's reply brief in support (Dkt. No. 52) is referred to as "AT&T's Reply" and its exhibits as "AT&T Reply Ex."; Beehive Telephone's memorandum in support of its motion for summary judgment (Dkt. No. 47) is referred to as "Beehive's Br." and its exhibits as "Beehive Ex."; AT&T's opposition (Dkt. No. 44) is referred to as "AT&T's Opp. Br."; Beehive Telephone's reply brief in support (Dkt. No. 53) is referred to as "Beehive's Reply" and its exhibits as "Beehive Reply Ex."; and the "BTC Dep. Ex." references indicate that the exhibit in question is a plaintiff's deposition exhibit.

3

4.      These access services were provided pursuant to the Beehive Companies' interstate access tariff on file with the FCC, hereinafter referred to as Beehive Tariff FCC No. 1.[4] This tariff specified the regulations, rates, terms and conditions pursuant to which Beehive Telephone and Beehive Nevada provided interstate access services.  AT&T Ex. 2, BTC Dep. Ex. 5, BTC 1326-1330 (relevant pages of Beehive Tariff FCC No. 1).

5.      End user customers are served out of end office switches.  During the relevant period, both Beehive Telephone and Beehive Nevada owned and operated end office switches, Beehive Telephone's are located in Utah and Beehive Nevada's are located in Nevada.  AT&T Ex. 1, McCown Dep. at 26-38.  *See also* AT&T Ex. 4 (excerpts of Beehive Telephone's bills) and AT&T Ex. 5 (excerpts of Beehive Nevada's bills).[5]

6.      Tandem switches connect and route traffic to end offices.  In this case, there are two kinds of tandems.  The first is an "access tandem."  It provides interexchange carriers such as AT&T with access to the networks of local exchange carriers like Beehive Telephone and Beehive Nevada.  The other kind is an "intermediate tandem."  It lies between the access tandem and the end office.  AT&T Ex. 6, BTC Dep. Ex. 5, BTC 1342 (the Beehive Companies' Transmittal 32 to the FCC, hereafter "Transmittal 32").

7.      During the relevant period, Beehive Telephone owned and operated several tandem switches located in Utah.  AT&T Ex. 3, Lukas Dep. at 57-58; AT&T Ex. 1, McCown Dep. at 26-32.  *See also* AT&T Ex. 7, BTC Dep. Ex. 9, BTC 861-62 (December 6, 2006 e-mail

---

[4] During the relevant period, the Beehive Companies shared the same FCC tariff.  AT&T Ex. 3, Deposition of Russell Lukas ("Lukas Dep.") at 27-29.  Mr. Lukas is outside legal counsel for Beehive Telephone and Beehive Nevada.  Lukas Dep. at 5-6.
[5] AT&T Exhibits 4 and 5 contain relevant excerpts of the Beehive Companies' bills produced with Beehive Telephone's initial disclosures.  The bills show that both companies owned and operated end office switches; the bills themselves identify the end office switches by CLLI code.

from Russell Lukas to Linda Cross, hereafter "12/6/06 email from Lukas to Cross").  Its

principal tandem was located in Wendover, Utah.  This Wendover, Utah tandem was designated

as "an intermediate tandem."  AT&T Ex. 6, BTC Dep. Ex. 5, BTC 1342 (Transmittal 32).  The

other Beehive Telephone tandems were also designated "intermediate tandems."  AT&T Ex. 1,

McCown Dep. at 26.  *See also* AT&T Exs. 4 and 5.[6]  During the relevant period, Beehive

Nevada did not own any tandem switches.  AT&T Ex. 1, McCown Dep. at 38-39.

       8.      During the relevant period, the access tandem that provided access to Beehive

Nevada's network was located in Reno, Nevada and was owned and operated by Nevada Bell.

AT&T Ex. 6, BTC Dep. Ex. 5, BTC 1342 (Transmittal 32).  During the relevant period, the

access tandems that provided access to the Beehive Telephone network were located in Utah and

were owned and operated by Qwest.  *Id.*

       9.      During the relevant period, AT&T calls that terminated or originated on Beehive

Nevada's network were routed through the Beehive Telephone intermediate tandem located in

Wendover, Utah.  AT&T Ex. 3, Lukas Dep. at 19-20.  During the relevant period, the vast

majority of AT&T calls that terminated or originated on Beehive Telephone's network were

routed through one of Beehive Telephone's intermediate tandems.  AT&T Ex. 3, Lukas Dep. at

19-20; AT&T Ex. 1, McCown Dep. at 7-8.  The large majority of these tandem-routed calls were

routed through Beehive Telephone's intermediate tandem in Wendover, Utah.  AT&T Ex. 3,

Lukas Dep. 19-20; AT&T Ex. 1, McCown Dep. at 7-8.

---

[6] AT&T Exhibits 4 and 5 contain relevant excerpts of the Beehive Companies' bills produced with Beehive
Telephone's initial disclosures.  These bills refer to Beehive Telephone's tandems as "intermediate tandem[s]" and
to the Qwest and Nevada Bell tandems as "AT" or "access tandem."

10.     During the relevant period, Beehive Tariff FCC No. 1 provided in Section 6 ("Switched Access Services") as follows:

> "6.1.  Regulations, Terms and Conditions for Switched Access are the same as those set forth in Section 6 of the National Exchange Carrier Association's Tariff FCC No. 5, unless further set forth herein:"

AT&T Ex. 2, BTC Dep. Ex. 5, BTC 1327.  The exceptions to this statement listed thereafter in Section 6 do not affect or involve the services at issue in this case.  *Id.*; AT&T Ex. 3, Lukas Dep. at 27, 30-33.

11.     The National Exchange Carrier Association's Tariff FCC No. 5 (hereinafter "NECA 5"), Section 6.1.3(A)(3)(b) and (c) provided as follows:

> "(b)     The Tandem Switched Facility rate recovers a portion of the costs of transmission facilities, including intermediate transmission circuit equipment, between the end points of interoffice circuits.  The Tandem Switched Facility rate specified in 17.2.2 following is applied on a per access minute per mile basis for all originating and terminating minutes of use routed over the facility.

> "(c)     The Tandem Switched Termination rate recovers a portion of the costs of circuit equipment necessary for the termination of each end of each measured segment of the Tandem Switched Facility.  The Tandem Switched Termination rate specified in 17.2.2 following is applied on a per access minute basis (for all originating and terminating minutes of use routed over the facility) at each end of each measured segment of Tandem Switched Facility (e.g., at the end office, Feature Group A dial tone office, host office and the access tandem).  When the Tandem Switched Facility mileage is zero, neither the Tandem Switched Facility rate nor the Tandem Switched Termination rate will apply."

AT&T Ex. 8, BTC Dep. Ex. 5, BTC 1333.

12.     During the period 2004, 2005 and 2006, NECA 5 specified a TST rate that applied "per access minute per termination."  Beehive Ex. 3 at 41, 42.  During the period 2004

6

through March 31, 2006, the Beehive Tariff FCC No. 1 specified a TST rate that applied "per access minute per termination."  Beehive Ex. 2 at 33.

13.     On AT&T calls that terminated or originated on Beehive Nevada's network that were routed through the Beehive Telephone intermediate tandem in Wendover, Utah, AT&T was charged for TST at the rate specified in Beehive Tariff FCC No. 1 at three points:  the Nevada Bell, or incoming, side of the Wendover, Utah intermediate tandem; the end office, or outgoing, side of that intermediate tandem; and at Beehive Nevada's end offices.  AT&T Ex. 9 at 3(a)-3(c) (the Beehive Companies' discovery responses to questions posed at deposition and in a subpoena to Beehive Nevada); AT&T Ex. 3, Lukas Dep. at 17-19.[7]

14.     On AT&T calls on its network that were routed through one of its intermediate tandems, Beehive Telephone charged AT&T for TST at the rate specified in Beehive Tariff FCC No. 1 at three points:  the Qwest, or incoming, side of the intermediate tandem; the end office, or outgoing, side of that tandem; and at Beehive Telephone's end offices.  AT&T Ex. 11 (Beehive's Response to Interrogatory 1 of AT&T's Second Set of Discovery); AT&T Ex. 3, Lukas Dep. at 17-19; AT&T Ex. 1, McCown Dep. at 7-12; AT&T Ex 9 at 2(c)-2(e) (the Beehive Companies' discovery responses to questions posed at deposition and in a subpoena to Beehive Nevada).[8]

---

[7] AT&T Exhibit 9 contains the Beehive Companies' discovery responses to questions posed at deposition and in a subpoena to Beehive Nevada.  The responses marked "2(a) through 2(e)" relate to Beehive Telephone, and those marked "3(a) through 3(f)" relate to Beehive Nevada.  As the responses in 3(c) and 3(d) show, through November 20, 2005, AT&T was charged three times the TST rate on each AT&T call carried on the Beehive Nevada network.  For the next three months, AT&T was charged only one time the TST rate, and the two charges at the Beehive Telephone tandem were omitted.  Beehive Nevada resumed charging three times the TST rate on February 21, 2006.  See entries for April 1 and May 1, 2006 in AT&T Ex. 9 at 3(c).

[8] As with Beehive Nevada, for three months beginning November 21, 2005, Beehive Telephone charged only one time the TST rate; it resumed charging three times the TST rate on February 21, 2006.  See AT&T Ex. 9, entries for April 1 and May 1, 2006 in 2(c), (d), and (e).  Also, see entries for April 1 and May 1 in the response to Interrogatory 1(a) and 1(c) in AT&T Exhibit 11.

7

15.     In 2005, Beehive Telephone and Beehive Nevada became involved in a billing dispute with Verizon and Qwest, two interexchange carriers, regarding the appropriate method for measuring mileage subject to the per mile Tandem Switched Facility ("TSF") charge defined in NECA 5 and incorporated by reference in Section 6 of Beehive Tariff FCC No. 1.  AT&T Ex. 12, BTC Dep. Exs. 5 & 6.  Subsequently, Beehive Telephone and Beehive Nevada became involved in an identical dispute with AT&T.  AT&T Ex. 13, BTC Dep. Exs. 7 & 8.

16.     Beehive Telephone and Beehive Nevada took the position that the mileage should be measured on the basis of the route actually taken by the call – *e.g.*, one measured TSF segment running from the Qwest or Nevada Bell access tandem to the Beehive Telephone intermediate tandem in Wendover, Utah plus a second measured TSF segment running from that intermediate tandem to the end office serving the end user customer who originated the call or to whom it was terminated.  AT&T Ex. 3, Lukas Dep. at 22-24, 42, 54-56.  AT&T and the other interexchange carriers took the position that under NECA 5, as incorporated by reference in Section 6 of Beehive Tariff FCC No. 1, there was only one measured TSF segment running "as the crow flies" directly from the Qwest or Nevada Bell access tandem to the end office serving the end user customer.  *Id.*

17.     Russell Lukas, the Beehive Companies' attorney, described the TSF dispute and its resolution in the following manner in his deposition:

> Q.     What did you understand that Linda Cross [an employee of Razorsight who represented Verizon and Qwest and later AT&T] alleged?
>
> A.     I believe she alleged that it was improper to measure the distance between the access tandem for Qwest or for Nevada Bell and Wendover.  And then to measure a separate segment between Wendover and the end office.

Q.      Her position was that you should take, as the measured segment for TSF purposes, the distance, the airline distance or mileage from the access tandem—let's talk about Qwest in Salt Lake City—the access tandem in Salt Lake City and the end office to which the call was ultimately terminated?

A.      That was her position, yes.

Q.      So that as the crow flies, it would be shorter than going to the Wendover tandem, and then from the Wendover tandem, maybe through other tandems to the end office? Is that it in broad strokes?

A.      In very broad strokes, yes.

Q.      And so Beehive had been charging, you know, the mileage charge for TSF based upon the actual route that the call took?

A.      In broad strokes, yes.

Q.      And Linda Cross and her clients, including AT&T, I guess later on, were saying that, no, the mileage should be as the crow flies between the access tandem and the ultimate end office?

A.      That was their position.

Q.      And did, did Beehive ultimately agree to bill based upon those carriers' position?

A.      Ultimately they did.

Q.      And you didn't change the tariff to do that?

A.      No.

Q.      So when we see credits referred to here, we're talking about credits based on the fact that for some period in the past these carrier[s] had paid based upon the mileage of the route the call actually took as opposed to the airline mileage between the end office and the access tandem?

A.      Yes.

AT&T Ex. 3, Lukas Dep. at 22-24.

In his December 6, 2006 e-mail to Linda Cross, who was representing

AT&T, Mr. Lukas responded as follows to AT&T's TSF claim:

9

"As we understand your email, AT&T is making two claims:  (1) that the mileage used to compute Beehive's monthly tandem switched facility ("TSF") charges should have been calculated on airline distances from either the Qwest access tandem at Salt Lake City or the Nevada Bell access tandem at Reno to Beehive's end office switches . . .

"Beehive has approved AT&T's claim with respect to the disputed TSF charges and has begun issuing AT&T credits. . . .

"Because it recognized its error in calculating transport mileage in December 2005, Beehive has decided to credit AT&T's accounts for the amounts it was overcharged TSF rates by invoices dated December 1, 2003 through December 1, 2005. . . . "

AT&T Ex. 7, BTC Dep. Ex. 9, BTC 861 (12/6/06 email from Lukas to Cross).

18.     Beehive Telephone and Beehive Nevada developed their TSF rate in effect in 2004, 2005 and 2006 using the airline distances between the Qwest and Nevada Bell access tandems and the Beehive Telephone and Beehive Nevada end offices.  Beehive Ex. 1, at p. 8, ¶ 37.

19.     In 2005, Beehive Telephone became involved in a billing dispute with Verizon and Qwest over TST charges.  AT&T Ex. 12, BTC Dep. Exs. 5 & 6.  Subsequently, it became involved in an identical dispute with AT&T.  AT&T Ex. 13, BTC Dep. Exs. 7 & 8.  The dispute with AT&T resulted in this lawsuit.  In this dispute, AT&T and the other interexchange carriers took the position that because there was only one measured segment of the TSF – one end at the access tandem owned by Qwest or Nevada Bell and the other end at the Beehive Telephone or Beehive Nevada end office, Beehive Telephone and Beehive Nevada were permitted under Beehive Tariff FCC No. 1 to charge only one time the TST rate per call at their end offices. AT&T Ex. 13, BTC Dep. Exs. 7 & 8.  *See also* AT&T Ex. 3, Lukas Dep. at 17-19.  NECA 5, Section 6.1.3(A)(3)(c), incorporated by reference in Beehive Tariff FCC No. 1, during the

10

relevant period provided in relevant part:  "The Tandem Switched Termination rate . . . is applied

on a per access minute basis . . . at each end of each measured segment of Tandem Switched

Facility . . . ."  AT&T Ex. 8, BTC Dep. Ex. 5, BTC 1333.

20.     As a result of the TST dispute, Beehive Telephone and Beehive Nevada asked the

Federal Communications Commission ("FCC") to allow them to increase their TST rate.  AT&T

Ex. 7, BTC Dep. Ex. 9, BTC 861-62 (12/6/06 e-mail from Lukas to Cross); AT&T Ex. 3, Lukas

Dep. at 38-47, 70-82.

21.     On January 13, 2006, Russell Lukas, the Beehive Companies' attorney, sent an

e-mail to the FCC attaching e-mails from the Beehive Companies' consultant, Sharon Minor, and

Jeff Dupree of NECA.  AT&T Ex. 14, BTC Dep. Ex. 10, BTC 869-873.  Ms. Minor's e-mail was

directed to Jeff Dupree and dated January 9, 2006; it states "As I mentioned in our phone

conversation, it appears to us that only 1 termination should be billed by the ILEC [incumbent

local exchange carrier]."  AT&T Ex. 14, BTC Dep. Ex. 10, BTC 870.  Mr. Dupree responded on

January 10, 2006 as follows:

> "We've reviewed the materials and they are consistent with our
> discussion yesterday.  According to NECA Tariff No. 5, a NECA TS
> tariff participant only gets to bill one TST and its negotiated portion
> of TSF between its end office and the RBOC tandem [Regional Bell
> Operating Company, like Qwest and Nevada Bell] when the IXC
> [interexchange carrier, like AT&T] orders DTT to the RBOC tandem
> as depicted in the diagrams.  As we also discussed, I don't see any
> situation where the TST can be ordered 3 times on the same route.
>
>                    *        *        *
>
> "I don't see an issue with using the materials to reflect how the NECA
> tariff is applied.  Note, however, that these materials would only be
> representative for a non-NECA TS participant if there are no
> differences in the application of TST/TSF/TS rate elements in its
> tariff."

*Id.*  At the time, Beehive Telephone and Beehive Nevada were "non-NECA TS participant[s]."

AT&T Ex. 3, Lukas Dep. at 26-27, 77.  Therefore, Mr. Dupree's remarks were representative for

Beehive Telephone and Beehive Nevada only "if there are no differences [from NECA 5] in the

application of TST/TSF/TS rate elements in its [Beehive Telephone/Beehive Nevada's] tariff."

AT&T Ex. 14, BTC Dep. Ex. 10, BTC 870.

      22.     On January 31, 2006, Russell Lukas e-mailed to the FCC the proposed Beehive

Telephone/Beehive Nevada tariff revisions.  AT&T Ex. 14, BTC Dep. Ex. 10, BTC 874.  In his

e-mail, Mr. Lukas stated that "Beehive is relying on the NECA interpretation of its tariff that was

e-mailed to [you] on January 13."  *Id.*

      23.     Beehive Telephone and Beehive Nevada made their submission that was

approved by the FCC on March 17, 2006 in Transmittal No. 32.  In that Transmittal, Beehive

Telephone and Beehive Nevada represented as follows:

> "Figures 1 and 2 are copies of materials provided by NECA that are
> consistent with its interpretation of § 6.1.3(A)(3) of its Tariff 5 as it
> applies when an intermediate tandem is employed.  Only one
> termination charge is applied by the terminating carrier where the
> access tandem function is provided by another LEC.  Facility charges
> apply for the mileage between the end office and the access tandem.
>
> "Beehive has an intermediate tandem switch at Wendover, Utah
> interconnected between Beehive's end offices and tandem switches
> owned by other incumbent local exchange carriers.  A Nevada Bell
> access tandem at Reno, Nevada switches traffic originating from and
> terminating to Beehive end offices in Nevada; a Qwest access tandem
> at Salt Lake City, Utah switches traffic originating from or
> terminating to Beehive end offices in Utah.  Beehive's intermediate
> tandem switch performs tandem switching for traffic originating and
> terminating to Beehive's subtending end offices, but is not designated
> as an access tandem."

AT&T Ex. 6, BTC Dep. Ex. 5, BTC 1342 (Transmittal 32).

12

24.     According to Beehive Telephone, in bills dated August 1, 2004 through May 1, 2006, Beehive Telephone billed AT&T $512,791.32 for TST; and if it had charged only one time the TST rate, at the end office, per access minute it would have billed AT&T $228,928.98 for TST in those bills.  AT&T Ex. 9 at 2(c)-2(e) (the Beehive Companies' discovery responses to questions posed at deposition and in a subpoena to Beehive Nevada).  The total amount billed for TST at Beehive Telephone's intermediate tandems was $283,862.34.  *See* AT&T Ex. 15.[9]

25.     According to Beehive Nevada, in bills dated August 1, 2004 through May 1, 2006, Beehive Nevada billed AT&T $862,739.74 for TST; and if it had charged only one time the TST rate, at the end office, per access minute it would have billed AT&T $332,958.10 for TST in those bills.  AT&T Ex. 9 at 3(c)-3(f) (the Beehive Companies' discovery responses to questions posed at deposition and in a subpoena to Beehive Nevada).  The total amount billed for TST at Beehive Telephone's intermediate tandems was $529,781.64.  *See* AT&T Ex. 15.[10]

26.     When Beehive Nevada used, or employed, Beehive Telephone's intermediate tandem, Beehive Nevada paid for that use.  AT&T Ex. 1, McCown Dep. at 60.

---

[9] AT&T Exhibit 15 is AT&T's calculation of the overcharges based on Beehive Telephone's and Beehive Nevada's own admissions regarding the total amount charged AT&T for TST on traffic routed through Beehive Telephone's intermediate tandems, and what AT&T would have been charged for TST if it had not been billed for two TSTs at these intermediate tandems.  Specifically, in calculating the overcharges billed by Beehive Telephone, AT&T subtracted the total amount Beehive Telephone would have billed AT&T for TST if it had not charged for two TSTs at the intermediate tandems [*i.e.,* the total of the amounts listed in AT&T Ex. 9 at 2(e)] from the total amounts billed [*i.e.,* the total of the amounts listed in AT&T Ex. 9 at 2(c) and (d)].  The total was $283,862.34 [$512,791.32 (the total of the amounts listed in AT&T Ex. 9 at 2(c) and (d)) minus $228,928.98 (the total of the amounts listed in 2(e))].

[10] With respect to the overcharge billed by Beehive Nevada, Beehive Nevada admitted that it billed three TSTs on all calls routed through Beehive Telephone's intermediate tandem (two at the intermediate tandem and one at the end office), except those during a three month period (see fns. 6 & 7).  For those calls on which Beehive Nevada admitted to have charged two TSTs at the intermediate tandem, AT&T calculated the overcharge by multiplying the amounts Beehive Nevada would have charged if it had billed one time the TST rate (listed in AT&T Ex. 9 at 3(f)) by 2.  The total was $529,781.64.

27. During the period August 1, 2004 through June 30, 2007, Section 2 of Beehive

Telephone's interstate access tariff (Beehive Tariff FCC No. 1) incorporated by reference section

2.4.1(D)(6)(a) of NECA 5, which provided throughout this period as follows:

(6)    If the customer pays the bill in full by the payment due date, and later initiates a billing
       dispute after (90) days of the payment due date, penalty interest may be applicable.

       (a)    If the billing dispute is resolved in favor of the customer, the customer shall
              receive a credit from the Telephone Company.  This credit will be an amount
              equal to the disputed amount resolved in the customer's favor times a penalty
              factor.  This amount will apply from the date of the dispute through the date on
              which the customer receives the disputed amount credit from the Telephone
              Company.  The penalty factor shall be the lesser of:

              (i)    the highest interest rate (in decimal value) which may be levied by law for
                     commercial transactions, compounded daily for the number of days from
                     the first date to and including the last date of the period involved, or

              (ii)   0.000292 per day, compounded daily for the number of days from the first
                     date to and including the last date of the period involved.

AT&T Ex. 16 (Beehive's Answers to AT&T's First Set of Discovery, Request to Admit 5).

## ANALYSIS

**I.   Governing Legal Standard**

Summary judgment is proper when there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter or law.  Fed. R. Civ. P. 56(c).  Where the

moving party has carried its burden of showing that the pleadings, depositions, answers to

interrogatories, admissions and affidavits in the record construed favorably to the non-moving

party, do not raise a genuine issue of material fact for trial, entry of summary judgment is

appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The existence of some factual

dispute does not defeat a properly supported motion for summary judgment; rather, the disputed

factual issue must be "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "A

14

disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

## II.    Under The Filed Rate Doctrine, Beehive Tariff FCC No. 1 Is Determinative Of The Outcome Of This Controversy.

Under controlling federal law, Beehive Telephone (as well as its sister company Beehive Nevada) cannot deviate from the regulations, terms, conditions and rates set forth in its interstate access tariff, Beehive Tariff FCC No. 1. "The federal filed rate doctrine, codified at 47 U.S.C. 203, is a central tenet of telecommunications law." *Ton Services, Inc. v. Qwest Corp.* 493 F.3d 1225, 1236 (10th Cir. 2007). "In the telecommunications context, the doctrine provides that once a carrier's tariff is approved by the FCC [or an appropriate state agency], the terms of the federal tariff are considered to be the law and therefore conclusively and exclusively enumerate the rights and liabilities as between the carrier and the customer." *Id.* (internal quotations omitted). *See also Qwest Corp. v. AT&T*, 479 F.3d 1206, 1210 (10th Cir. 2007) ("The filed-rate doctrine, or filed-tariff doctrine, provides that the rate of the carrier duly filed is the only lawful charge and deviation from it is not permitted upon any pretext.") (internal quotes omitted); *Union Tel. Co. v. Qwest Corp.* 495 F.3d 1187, 1193 (10th Cir. 2007) ("Duly filed rates bind both carriers and customers with the force of law.") The rationale for the filed rate doctrine is straightforward:

15

the legal relationship between a utility and its customers is defined *entirely* by the applicable tariff.  *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 416-17 (1986); *Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 163 (1922).

The doctrine applies to more than just the rate; it applies with equal force to the rules, terms and conditions that govern how the rate is applied.  *AT&T v. Central Office Tel., Inc.,* 524 U.S. 214, 221-24 (1998) ("COT") (stating that "[r]ates . . . do not exist in isolation" and "have meaning only when one knows the services to which they are attached;" and that section 203(c) "makes it unlawful to 'extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges' except those set forth in the tariff.").  *See also Ton Services Inc.,* 493 F.3d at 1236 ("[T]he [filed rate] doctrine provides that once a carrier's tariff is approved by the FCC [or an appropriate state agency], the *terms* of the federal tariff are considered to be the law and therefore conclusively and exclusively enumerate the rights and liabilities as between the carrier and the customer.  In order to prevent price discrimination and preserve agencies' exclusive role in ratemaking, courts have no power to adjudicate claims which would *invalidate, alter, or add to the terms of the filed tariff*.") (emphasis added) (internal cites and quotes omitted); *Iowa Network Services, Inc. v. Qwest Corp.,* 466 F.3d 1091, 1097 (8th Cir. 2006); *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665, 668 (7th Cir. 2005) ("The [filed rate] doctrine also applies to non-rate provisions of a tariff, such as 'provisioning of services and billing,' so carriers may not depart from non-price terms, either.");  *Evanns v. AT&T Corp.,* 229 F.3d 837, 840 (9th Cir. 2000).  Thus, the doctrine not only bars the Beehive Companies from charging a TST rate different from that

16

specified in the tariff, it also prohibits them from applying that rate in a manner different from that required by the tariff.

The filed rate doctrine bars suits seeking damages from a utility based on allegations that the utility's rates, as reflected in an effective tariff filed with a regulatory agency, are too high or otherwise unreasonable, or that the plaintiff was entitled to rates or service that differed from the filed tariff. *COT,* 524 U.S. at 221-24; *Square D. Co.,* 476 U.S. at 422 & n.28; *Keogh,* 260 U.S. at 160-64. Likewise, the doctrine operates to prevent a carrier from recouping losses from a tariff rate that ultimately is found to have been set unjustly or unreasonably low. *In the Matter of 1997 Annual Access Tariff Filings,* 13 FCC Rcd 10597, ¶ 8 (Rel. Mar. 31, 1998) (citing *Federal Power Comm'n v. Tennessee Gas Co.,* 371 U.S. 145, 152-53 (1962) ("[A] rate for one class or zone of customers may be found by the Commission to be too low, but the company cannot recoup its losses by making retroactive the higher rate subsequently allowed."). *See also In the Matter of 1993 Annual Access Tariff Filings 1994 Annual Access Tariff Filings,* 20 FCC Rcd 6077, ¶ 10 (Rel. Mar. 17, 2005) ("[E]fforts to recoup past undercharges . . . amounted to an impermissible retroactive rate increase.") (citing *Federal Power Comm'n,* 371 U.S. at 152-53).

The filed rate doctrine "is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress." *Qwest Corp.* 479 F.3d at 1210 (internal quotation omitted). *See also Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97 (1915) (The "rate of the carrier duly filed is the only lawful charge," and accordingly the doctrine "is undeniably strict."); *Id.* ("Ignorance . . . of rates is not an excuse for paying or charging either less or more than the rate filed.").

17

The Court turns now to the dispositive question:  During the relevant period, did Beehive Tariff FCC No. 1 permit Beehive Telephone and Beehive Nevada to charge for two TSTs at the intermediate tandem or did it, as AT&T contends, restrict them to one charge for TST per access minute, at their end offices?

### III.   Beehive Telephone (And Beehive Nevada) Have Admitted That Their Tariff Only Permitted Them To Charge For TST One Time Per Access Minute, At Their End Offices.

As an initial matter, the Court needs to address a contention raised by Beehive Telephone's counsel at oral argument on November 16, 2009.  Counsel asserted that the Beehive Companies' tariff is ambiguous and that to determine its meaning, the Court would need to hold a trial and hear and consider testimony and other evidence.[11]  Tariff interpretation or "construction is a legal and not a factual exercise."  *Missouri Pacific Railroad Co. v. Independent Mills, Inc.*, 706 F.2d 1080, 1083 (10th Cir. 1983); *American Airlines, Inc. v. Platinum World Travel*, 717 F. Supp. 1454, 1461 n.15 (D. Utah 1989) ("Tariff interpretation is generally a question of law.").

In any event, here there is no need for interpretation.  Beehive Telephone (and Beehive Nevada) told the FCC what their tariff means in clear, unambiguous terms, and, as discussed in the next section of this Analysis, Beehive Telephone is judicially estopped to take a contrary position in this case.

During the relevant period, NECA 5 (§ 6.1.3(A)(3)(b) and (c)) provided:

---

[11] This is at odds with what Beehive Telephone said in its Opposition Brief.  There, Beehive Telephone states that in the event the Court determines the tariff to be "ambiguous," the Court "would be completely justified in construing the ambiguity . . . in favor of AT&T."  Beehive Opp. Br. at 35.  It is also logically inconsistent with Beehive Telephone's argument that it is entitled to summary judgment on its refund immunity theory.  As discussed more fully below, Beehive Telephone would be shielded from refund liability only if it had complied with its tariff.  Accordingly, in asserting that the Court could grant summary judgment to Beehive Telephone, Beehive Telephone was necessarily taking the position that there are no disputed facts relating to the meaning of its tariff.

18

(b)      The Tandem Switched Facility rate recovers a portion of the costs of transmission facilities, including intermediate transmission circuit equipment, between the end points of interoffice circuits.  The Tandem Switched Facility rate specified in 17.2.2 following is applied on a per access minute per mile basis for all originating and terminating minutes of use routed over the facility.

(c)      The Tandem Switched Termination rate recovers a portion of the costs of circuit equipment necessary for the termination of each end of each measured segment of the Tandem Switched Facility.  The Tandem Switched Termination rate specified in 17.2.2 following is applied on a per access minute basis (for all originating and terminating minutes of use routed over the facility) at each end of each measured segment of Tandem Switched Facility (e.g., at the end office, Feature Group A dial tone office, host office and the access tandem).  When the Tandem Switched Facility mileage is zero, neither the Tandem Switched Facility rate nor the Tandem Switched Termination rate will apply.

Under NECA 5, the TST rate was applied "per access minute per termination."  And the TSF rate was applied "per access minute per mile."  Beehive Ex. 3 at 41, 42.  During the period ending March 31, 2006, except for the specified rate (the "$.00xx" that goes before "per access minute per termination" and "per access minute per mile"), the Beehive tariff's rules, terms and conditions governing TST and TSF were *identical* to those in NECA 5.  See and compare Beehive Ex. 2 at 33 and Beehive Ex. 3 at 41, 42.

In 2004 and 2005 Beehive Telephone took the position that the NECA tariff and therefore its tariff permitted it to charge for TST at both sides of its intermediate tandem as well as at its end office – *i.e.*, three times the tariffed TST rate per access minute.  In 2005 several interexchange carriers took issue with this, and took the position that the tariff permitted only one TST charge per access minute.  See AT&T Exs. 12 & 13; see also AT&T Ex. 3, Lukas Dep. at 17-19.

In response, Beehive Telephone (1) disputed these carriers' position and (2) requested that the FCC permit it to increase its TST rate nearly threefold. AT&T Ex. 7, BTC 861-62; AT&T Ex. 3, Lukas Dep. at 38-47, 70-82. In connection with its request to the FCC, Beehive Telephone (1) presented to the FCC evidence from NECA that NECA 5 permitted a carrier to charge for only one TST, at the end office, under the circumstances present here (*i.e.*, where another carrier provides the access tandem function), and (2) represented to the FCC that the TST rate was applied the same way in the Beehive tariff as it was in NECA 5.

Specifically, on January 13, 2006, Russell Lukas, the Beehive Companies' attorney, sent an e-mail to the FCC attaching e-mails from their consultant, Sharon Minor, and Jeff Dupree of NECA. AT&T Ex. 14, BTC 869-873. Ms. Minor's e-mail was directed to Jeff Dupree and dated January 9, 2006; it states "As I mentioned in our phone conversation, it appears to us that only one termination should be billed by the ILEC [incumbent local exchange carrier]." AT&T Ex. 14, BTC 870. Mr. Dupree responded on January 10, 2006 as follows:

> "We've reviewed the materials and they are consistent with our discussion yesterday. According to NECA Tariff No. 5, a NECA TS tariff participant only gets to bill one TST and its negotiated portion of TSF between its end office and the RBOC [Regional Bell Operating Company, like Qwest] tandem when the IXC [interexchange carrier, like AT&T] orders DTT to the RBOC tandem as depicted in the diagrams. As we also discussed, I don't see any situation where the TST can be ordered 3 times on the same route.

> \*          \*          \*

> "I don't see an issue with using the materials to reflect how the NECA tariff is applied. *Note, however, that these materials would only be representative for a non-NECA TS participant if there are no differences in the application of TST/TSF/TS rate elements in its tariff.*"

*Id.*  (Emphasis added).  At the time, Beehive Telephone was a "non-NECA TS participant."

AT&T Ex. 3, Lukas Dep. at 26-27, 77.  Therefore, Mr. Dupree's remarks were representative for

Beehive Telephone and Beehive Nevada only "if there are no differences [from NECA 5] in the

application of TST/TSF/TS rate elements in its [Beehive Telephone/Beehive Nevada's] tariff."

AT&T Ex. 14, BTC 870.

On January 31, 2006, Mr. Lukas e-mailed to the FCC the proposed Beehive

Telephone/Beehive Nevada tariff revisions.  AT&T Ex. 14, BTC 874.  In his e-mail, Mr. Lukas

stated that "Beehive is relying on the NECA interpretation of its tariff that was e-mailed to [you]

on January 13."  *Id.*  Thus, the Beehive Companies both admitted and represented to the FCC,

clearly and unambiguously, that (a) there was no difference in the application of the TST rate

element between its tariff and NECA 5, and (b) the NECA tariff permitted only one TST charge,

at the end office, per access minute.

The Beehive Companies followed up these admissions and representations with a formal

submission to the FCC.  Dated March 17, 2006, this submission was approved by the FCC.   The

submission represented as follows:

> "Figures 1 and 2 are copies of materials provided by NECA that are
> consistent with its interpretation of § 6.1.3(A)(3) of its tariff 5 as it
> applies when an intermediate tandem is employed.  *Only one*
> *termination charge is applied by the terminating carrier where the*
> *access tandem function is provided by another LEC.*  Facility charges
> apply for the mileage between the end office and the access tandem.
>
> "Beehive has an intermediate tandem switch at Wendover, Utah
> interconnected between Beehive's end offices and tandem switches
> owned by other incumbent local exchange carriers.  A Nevada Bell
> access tandem at Reno, Nevada switches traffic originating from and
> terminating to Beehive end offices in Nevada; a Qwest access tandem
> at Salt Lake City, Utah switches traffic originating from or
> terminating to Beehive end offices in Utah.  *Beehive's intermediate*

21

> *tandem switch performs tandem switching for traffic originating and terminating to Beehive's subtending end offices, but is not designated as an access tandem.*"

AT&T Ex. 6, BTC 1342 (emphasis added).

Beehive Telephone does not dispute or deny any of this.  Instead, it suggests that the Court should in effect ignore what NECA and the Beehive Companies told the FCC, because, according to Beehive Telephone, it does not matter.  Beehive Opp. Br. at 2.  To support this suggestion, Beehive cites *Theodore Allen Communications v. MCI Telecommunications Corp.*, 12 F.C.C.R. 6623, 6629 (FCC Com. Car. Bur. 1997), but all the Common Carrier Bureau said there was that:  "[U]nder the Filed Rate Doctrine and similar principles, any representations the parties may have made to each other regarding the discounts are secondary to the tariff language itself."  "Secondary" is not "irrelevant."  Moreover, and more importantly, the statements in question here are not statements that Beehive Telephone or Beehive Nevada made to AT&T; they are statements that the Beehive Companies made to a federal administrative agency to induce the agency to act in a manner favorable to those companies.

## IV.   Beehive Telephone Is Estopped To Deny That The Beehive Companies' Tariff Permits Only One TST Charge Per Access Minute, At The End Offices.

Under the judicial estoppel doctrine, where "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee,* 156 U.S. 680, 689 (1895)) (internal quotes omitted). The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Id.* at

22

749-50 (internal quotes and cites omitted).  *See also Johnson v. Lindon City Corp.* 405 F.3d

1065, 1068-69 (10th Cir. 2005) (finding that although the Tenth Circuit previously refused to

apply the judicial estoppel doctrine, "the Supreme Court's intervening decision in *New*

*Hampshire* has altered the legal landscape" and, "[a]ccordingly, we must follow the guidance of

the Court's binding precedent"); *Id.* (affirming grant of summary judgment in favor of defendant

based on judicial estoppel); *Beem v. McKune,* 317 F.3d 1175, 1186 (10th Cir. 2003) (O'Brien, J.

concurring) ("Now is the time to embrace the invitation extended by the Supreme Court in *New*

*Hampshire* and join other circuits in reining in those litigants who play 'fast and loose with the

courts.'") (quoting *Sperling v. United States,* 692 F.2d 223, 227 (2d Cir. 1982)).

While the circumstances under which judicial estoppel may be appropriate are not

"reducible to any general formulation of principle," "several factors typically inform the decision

whether to apply the doctrine in particular case."  First, "a party's later position must be clearly

inconsistent with its earlier position."  Second, "whether the party has succeeded in persuading a

court to accept that party's earlier position, so that judicial acceptance of an inconsistent position

in a later proceeding would create the perception that either the first or the second court was

misled."  Third, "whether the party seeking to assert an inconsistent position would derive an

unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New*

*Hampshire,* 532 U.S. at 750-51 (internal quotes and citations omitted).  *See also Johnson v.*

*Lindon City Corp.* 405 F.3d at 1069-70; *Beem v. McKune,* 317 F.3d at 1185.

The judicial estoppel doctrine applies where the first proceeding was an administrative

one, as is the case here.  *Lampi Crop. v. American Power Products, Inc.,* 228 F.3d 1365, 1377

(Fed. Cir. 2000) (The judicial estoppel "doctrine also applies to administrative proceedings in

23

which a party obtains a favorable order by making an argument that it seeks to repudiate in a subsequent judicial proceeding"); *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 604 (9th Cir. 1996) ("cases have applied the [judicial estoppel] doctrine where the prior statement was made in an administrative proceeding, and we are not aware of any case refusing to apply the doctrine because the prior proceeding was administrative"); *Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 6 (2d Cir. 1999) ("The prior inconsistent assertion need not be made to a court of law:  statements to administrative agencies . . . may also give rise to judicial estoppel."); *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427 (7th Cir. 1993) ("Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding."); *Smith v. Montgomery Ward & Co.,* 388 F.2d 291 (6th Cir. 1968) (judicial estoppel applied to position taken before the Workmen's Compensation Commission).

Application of these factors to the undisputed facts and circumstances of this case demonstrate that Beehive Telephone should be estopped from denying that its tariff permitted it to charge only one TST per access minute.  In a proceeding before the FCC asking that it be permitted to increase its TST rate, Beehive Telephone took the position that its tariff – the very same tariff at issue here – permitted it to charge for only one TST, at the end office, per access minute.  AT&T Ex. 6, BTC Ex. 5, BTC 1342 (Transmittal 32).  By arguing here that its tariff authorizes it to charge for three TSTs per access minute, Beehive Telephone is taking a position that is "clearly inconsistent with its earlier position."  Beehive Telephone also "succeeded in persuading" the FCC to accept its "earlier position" that its tariff permitted it to charge only one

TST per access minute; as a result, the FCC permitted Beehive Telephone's requested TST rate increase to go into effect.  AT&T Ex. 7, BTC Dep. Ex. 9, BTC 861-62 (12/6/06 email from Lukas to Cross).  Accepting Beehive Telephone's "inconsistent position" here – *i.e.*, that it is permitted to charge three TSTs per access minute – would plainly "create the perception that either the first or the second [agency or] court was misled."  Beehive Telephone would certainly "derive an unfair advantage or impose an unfair detriment" if it is not estopped:  Beehive Telephone told the FCC that its tariff permits it to charge for only one TST at the end office per access minute so that it could increase the TST rate AT&T must pay; yet it now takes the contrary position that its tariff permits it to charge three TSTs so that it can retain overcharges already paid by AT&T.  Beehive Telephone's change in position is precisely the type of "fast and loose" litigation tactic that the judicial estoppel doctrine was established to "rein[] in."  *See Beem,* 317 F.3d at 1186.

*       *       *

Beehive Telephone did not respond at all to AT&T's contention (which the Court finds meritorious for the reasons discussed above) that Beehive Telephone is judicially estopped to take a position contrary to its statements to the FCC.  See AT&T Br. at 23-26.  By its complete silence, Beehive Telephone has conceded that this contention is correct and has waived any argument or contention that could be employed to oppose it.  See *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992).  There, plaintiff Coffey appealed the district court's grant of summary judgment dismissing plaintiff's antitrust claims.  Plaintiff pleaded two theories of liability, group boycott and tying.  The defendant moved for summary judgment on both.  In opposing that motion, plaintiff focused solely on the arguments directed at his group boycott

25

theory; as to tying, he was completely silent – *i.e.*, he made no effort to address or rebut the defendant's arguments.  On appeal, Coffey attempted to raise arguments relating to the tying issue.  The appellate court declined to consider these arguments, finding that by failing to challenge or rebut the defendant's tying arguments, Coffey had essentially conceded their correctness and had waived the right to challenge them on appeal.  See also *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1325 (10th Cir. 1987).

**V.  Beehive Telephone's Attempts To Distance Itself And Its Tariff From NECA 5 Fail As A Matter Of Law.**

In its briefs supporting its motion for summary judgment (Dkt. No. 47) and opposing AT&T's motion for summary judgment (Dkt. No. 43), Beehive Telephone offers several purported reasons why NECA 5 should not be deemed controlling and why "AT&T's interpretation" of NECA 5 should be rejected.  See Beehive's Br. at 3, 12-13; Beehive's Opp. Br. at 33-34.  See also AT&T's Opp. Br. at 27-30; AT&T's Reply at 4.  The Court finds that Beehive Telephone's contentions lack merit.  First, Beehive Telephone itself told the FCC, in clear and unambiguous terms, that NECA 5 *was* controlling (and given that NECA 5 and Beehive Tariff FCC No. 1 were identical except for the rate, it is difficult to see how Beehive Telephone could have taken any other position); that NECA 5 indeed did address the situation present here (where the access tandem function is provided by another carrier); and that in this situation NECA 5 only permitted one charge for TST per access minute, at the end office.  Second, the interpretation in question is not AT&T's interpretation; it is NECA's interpretation of its own tariff – an interpretation that Beehive Telephone (and Beehive Nevada) told the FCC, again in clear and unambiguous terms, that the FCC should accept as valid.

26

**VI.    The Manner In Which The Beehive Companies Dealt With TSF Confirms That Their Tariff Only Permits One Charge For TST Per Access Minute, At The End Office.**

In 2005 Beehive Telephone and Beehive Nevada became involved in a billing dispute with Qwest and Verizon (two interexchange carriers) regarding the proper method for measuring mileage subject to the per access minute per mile TSF charge.  Subsequently, Beehive became involved in an identical dispute with AT&T.  AT&T Exs. 12 & 13.  The Beehive Companies took the position that the mileage should be measured on the basis of the route actually taken by the call -- *i.e.*, one measured segment of TSF running from the Qwest access tandem in Salt Lake City or the Nevada Bell tandem in Reno to the intermediate tandem in Wendover, Utah plus a second measured segment of TSF running from that intermediate tandem to the end office serving the customer who originated the call or to whom it was terminated.  AT&T and the other interexchange carriers took the position that under NECA 5 (as incorporated by reference in the Beehive tariff) there was only one measured segment running "as the crow flies" directly from the Qwest and Nevada Bell access tandems to the Beehive Companies' end offices.  AT&T Ex. 3, Lukas Dep. at 22-24, 42, 54-56.

Russell Lukas, Beehive's counsel, described the TSF dispute and its ultimate resolution as follows in his deposition in this case:

Q.      What did you understand that Linda Cross alleged?

A.      I believe she alleged that it was improper to measure the distance between the access tandem for Qwest or for Nevada Bell and Wendover.  And then to measure a separate segment between Wendover and the end office.

Q.      Her position was that you should take, as the measured segment for TSF purposes, the distance, the airline distance or mileage from the access tandem—let's talk about Qwest in Salt Lake City—the access tandem in Salt Lake City and the end office to which the call was ultimately terminated?

27

A.      That was her position, yes.

Q.      So that as the crow flies, it would be shorter than going to the Wendover tandem, and then from the Wendover tandem, maybe through other tandems to the end office?  Is that it in broad strokes?

A.      In very broad strokes, yes.

Q.      And so Beehive had been charging, you know, the mileage charge for TSF based upon the actual route that the call took?

A.      In broad strokes, yes.

Q.      And Linda Cross and her clients, including AT&T, I guess later on, were saying that, no, the mileage should be as the crow flies between the access tandem and the ultimate end office?

A.      That was their position.

Q.      And did, did Beehive ultimately agree to bill based upon those carriers' position?

A.      Ultimately they did.

Q.      And you didn't change the tariff to do that?

A.      No.

Q.      So when we see credits referred to here, we're talking about credits based on the fact that for some period in the past these carrier[s] had paid based upon the mileage of the route the call actually took as opposed to the airline mileage between the end office and the access tandem?

A.      Yes.

AT&T Ex. 3, Lukas Dep. at 22-24.

In his December 6, 2006 e-mail to Linda Cross, who was then representing

AT&T, Mr. Lukas responded as follows to AT&T's TSF claim:

> "As we understand your email, AT&T is making two claims:  (1) that the mileage used to compute Beehive's monthly tandem switched facility ("TSF") charges should have been calculated on airline distances from either the Qwest access tandem at Salt Lake City or

> the Nevada Bell access tandem at Reno to Beehive's end office switches . . .
>
> "Beehive has approved AT&T's claim with respect to the disputed TSF charges and has begun issuing AT&T credits. . . .
>
> "Because it recognized its error in calculating transport mileage in December 2005, Beehive has decided to credit AT&T's accounts for the amounts it was overcharged TSF rates by invoices dated December 1, 2003 through December 1, 2005. . . . "

AT&T Ex. 7, BTC 861.

The Beehive Companies thus admitted and acknowledged that under NECA 5 (and therefore their tariff) there was only one "measured segment" of TSF, one end of which was at the Qwest or Nevada Bell access tandem and the other end of which was at the Beehive end office. Under NECA 5 (and therefore the Beehive tariff), the *TST* rate "is applied on a per access minute basis . . . at each end of each measured segment of Tandem Switched Facility." AT&T Ex. 8, BTC 1333. The conclusion is inescapable: Because there is only one "measured segment," and because one end lies on the network of another carrier (at the Qwest or Nevada Bell access tandem), the Beehive Companies were permitted under their tariff to charge for only one TST per access minute, at their end of that single segment: their end office.

This conclusion is further confirmed by the manner in which the Beehive Companies claim to have developed their TSF rate and what they told the FCC about TSF in Transmittal 32. In his declaration (Beehive Ex. 1, at p. 8, ¶ 37), Mr. McCown states that the Beehive Companies' rate consultant developed the TSF rate based on the airline distance between the Qwest and Nevada Bell access tandems and the Beehive Telephone and Beehive Nevada end offices. Thus, the rate was based on the assumption that under the tariff, there was only one "measured segment" of TSF and therefore only one "termination" on the Beehive Telephone/Beehive

29

Nevada networks.  And that is precisely what the Beehive Companies told the FCC in

Transmittal 32.  See AT&T Ex. 6, BTC 1342 ("Facility charges apply for the mileage between

the end office and the access tandem.").

**VII.   The Undisputed Facts, As Well As Beehive Telephone's Admissions And Concessions, Establish That In Billing And Collecting For TST Charges At The Wendover, Utah Tandem, Beehive Nevada Was Acting As Beehive Telephone's Agent.**

Only Beehive Telephone owned and operated tandems; Beehive Nevada had no tandems.

Beehive Nevada employed, or used, Beehive Telephone's intermediate tandem; and when it did,

it was charged and paid for that use.  AT&T Ex. 1, McCown Dep. at 26-32, 38-39.  AT&T

interstate calls that terminated or originated on the Beehive Nevada network were routed through

*Beehive Telephone's* intermediate tandem in Wendover, Utah.  See Undisputed Material Facts,

¶ 9, *supra*.  On each of these calls, Beehive Nevada therefore employed, or used, the Beehive

Telephone intermediate tandem.  On each of these calls, AT&T was charged and paid for two

TSTs at that Beehive Telephone intermediate tandem.  *Id.* at ¶ 13.  The only reason that AT&T

was charged for these two TSTs was because its call was routed through and thereby employed,

or used, the Wendover, Utah tandem; had the call been routed directly from the Nevada Bell

access tandem to the end office, AT&T would have been charged for only one TST, at the end

office.  (AT&T Ex. 1, McCown Dep. at 25-38; Beehive's Opp. Br. at 2-3.)  Under the filed rate

doctrine, Beehive Telephone was required to charge and Beehive Nevada was required to pay the

same rate as anyone else who employed, or used, the intermediate tandem for interstate calls,

meaning that Beehive Nevada was charged and paid for two TSTs, the same as AT&T, on each

of the AT&T interstate calls that were routed through the Wendover, Utah tandem.  *Ton*

*Services, Inc.*, 493 F.3d at 1236; *Qwest Corp.*, 479 F.3d at 1210.  Accordingly, to the extent that

30

Beehive Nevada billed and collected for TSTs at the Beehive Telephone Wendover, Utah intermediate tandem, every dollar it collected from AT&T was paid over to Beehive Telephone. The billing and collection therefore was done for Beehive Telephone's sole benefit.  And given that the same individual was in charge of both companies throughout the relevant time period – Chuck McCown, the joint Chief Operating Officer (see AT&T Ex. 1, McCown Dep. at 4-5) – both companies intended and understood that to be the case.

AT&T contends that these facts – none of which Beehive Telephone disputes[12] – establish that in billing and collecting the two TST charges at the Wendover, Utah intermediate tandem, Beehive Nevada was acting as Beehive Telephone's agent under Utah law.[13]  The Court agrees.  "[A]n implied agency is . . . an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties."  3 Am. Jur. 2d Agency § 16.  "Whether an agency relationship exists depends upon all the facts and circumstances of the case."  *Albright v. Attorney's Title Ins. Fund,* 2008 WL 2952260, * 4 (D. Utah 2008).  *See also Gildea v. Guardian*

---

[12] Beehive Telephone acknowledges that Mr. McCown testified that Beehive Nevada "employed" Beehive Telephone's intermediate tandem, and that when it did, Beehive paid for that use.  Beehive Opp. Br. at 22-23 (responding to AT&T Statement of Undisputed Facts ("SOF") 25).  But it says that that doesn't mean Beehive Nevada "paid Beehive for the use of its Wendover tandem in routing AT&T's calls."  *Id.  That is precisely what it means.*  Beehive Telephone admits that all AT&T calls on the Beehive Nevada network were routed through the Wendover tandem owned by Beehive Telephone.  *Id.* at 10 (responding to AT&T SOF 9).  See also AT&T Ex. 3 (Lukas Dep. at 17-19).  Thus, Beehive Nevada "employed" the Wendover tandem on *all* AT&T calls, and Mr. McCown testified that Beehive Nevada paid Beehive Telephone when it did that.  Tellingly, Beehive Telephone doesn't deny the truth of SOF 25; doesn't deny that it was paid precisely what AT&T paid Beehive Nevada; and doesn't deny that in billing and collecting for two TSTs at the Wendover tandem, Beehive Nevada was acting on behalf and for the benefit of Beehive Telephone – in other words as its agent.  If any of these were not true, Beehive Telephone (and Mr. McCown) would have said so.  Indeed, if any of these were not true, Beehive Telephone (and Mr. McCown) were obligated under Rule 56(e) to have come forward and said so.

[13] Utah law controls because the billing and collection occurred in Utah [AT&T Ex. 17 (excerpts of Beehive Telephone and Beehive Nevada's invoices, both requesting that AT&T "remit payment" to Lake Point, Utah)]; the intermediate tandem that was the subject of the bills and payments is located in Utah [AT&T Ex. 6, BTC Dep. Ex. 5; BTC 1342 (Transmittal 32)]; and the principal, Beehive Telephone, is a Utah corporation headquartered here [Amended Complaint, ¶ 6; Answer, ¶ 4].  *Peck v. Horrocks,* 106 F.3d 949, 952 (10th Cir. 1997); *Waddoups Amalgamated Sugar Co.,* 54 P.3d 1054, 1059-60 (Utah 2002).

31

*Title Co. of Utah.,* 970 P.2d 1265, 1269 (Utah 1999) (same); *Advanced Restoration, L.L.C., v. Priskos,* 126 P.3d 786, 793 (Utah App. 2005) ("[I]n determining whether agency should be implied the facts of the transaction must be explored.") (internal quotations omitted).  "The manner in which the parties designate the relationship is not controlling, and if an act done by one [party on] behalf of another is in its essential nature one of agency, the one is the agent of such other notwithstanding that [the party] is not so called."  3 Am. Jur. 2d Agency § 19.  And directly dispositive here, Utah courts have held that an implied agency exists where the transaction entered by one was "really for the benefit of" another.  *Advanced Restoration,* 126 P.3d at 793.

The material "facts and circumstances" are undisputed, making summary disposition of this issue appropriate:  Beehive Telephone *alone benefited* from the TST charges purportedly billed and collected by Beehive Nevada, and the Beehive Companies *knew and intended* the charges collected from AT&T to be passed to Beehive Telephone dollar for dollar.  These undisputed facts demonstrate that Beehive Nevada acted as Beehive Telephone's agent to the extent it billed AT&T for TSTs at the Wendover tandem.  And it is black letter law that Beehive Telephone, as the principal, is liable for the authorized acts of its agent, Beehive Nevada, just as though the principal performed them itself.  *Garland v. Fleischmann*, 831 P.2d 107, 110 (Utah 1992) ("It is well established in the law that  a principal is liable for the acts of his agent within the scope of the agent's authority, irrespective of whether the principal is disclosed or undisclosed.").

Beehive Telephone does not dispute or contest any of this.  Except for the unsubstantiated attempt to re-characterize Mr. McCown's testimony (see fn. 12, *supra*), Beehive

Telephone's Opposition Brief does not respond at all to AT&T's demonstration that to the extent

it billed and collected for two TSTs at the Beehive Telephone intermediate tandem, Beehive

Nevada was acting as Beehive Telephone's agent; that such billing and collection solely and

exclusively benefited Beehive Telephone; and that Beehive Telephone is therefore liable for the

improper TSTs billed and collected by Beehive Nevada.  By its complete silence, Beehive

Telephone has conceded that this demonstration is correct and has waived any argument or

contention that could be employed to oppose that demonstration.  See *Coffey v. Healthtrust,* 955

F.2d at 1393; see also *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d at 1325.

*     *     *

Even if it could somehow be said that under the undisputed "facts and circumstances"

discussed above, Beehive Nevada should not be deemed to be Beehive Telephone's agent, there

is an alternative reason why Beehive Telephone is liable for the amounts billed and collected by

Beehive Nevada and transferred to Beehive Telephone:  unjust enrichment.[14]

"Unjust enrichment of a person occurs when he has and retains money or benefits which

in justice and equity belong to another." *Jeffs v. Stubbs,* 970 P.2d 1234, 1248 (Utah 1998)

(quoting *Baugh v. Darley,* 184 P.2d 335 (Utah 1947) (internal quotes omitted).  *See also Hess v.*

*Johnston,* 163 P.3d 747, 754 (Utah App. 2007) (same).  "The facts underlying unjust enrichment

claims vary greatly from case to case, and the doctrine of unjust enrichment was specifically

developed to address situations that did not fit within a particular legal standard but which

nonetheless merited judicial intervention." *Allen v. Hall,* 148 P.3d 939, 945 (Utah 2006).  Under

---

[14] Count III of the Amended Complaint states a claim based on unjust enrichment.  Utah law governs this claim because the overcharges were billed and collected in Utah, were based on use of a tandem located in Utah, and Beehive Telephone, a Utah corporation and the conferee, is headquartered here.  *Supra,* fn. 12.

33

Utah law, a successful action for unjust enrichment requires three elements: (1) "there must be a benefit conferred on one person by another"; (2) "the conferee must appreciate or have knowledge of the benefit"; (3) "there must be the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Dummar v. Lummis,* 543 F.3d 614, 623 (10th Cir. 2008). "The benefit conferred on the defendant . . . is the measure of recovery." *Alpha Partners, Inc. v. Transamerica Investment Management, L.L.C.,* 153 P.3d 714, 723 (Utah App. 2006) (quoting *Bailey-Allen Co.,* 876 P.2d 421, 425-26 (Utah App. 1994) (internal quotes omitted). *See also American Towers Owners Association, Inc. v. CCI Mechanical, Inc.,* 930 P.2d 1182, 1192 (Utah 1996) ("the remedy is one of restitution designed to restore to a plaintiff a benefit unjustly enjoyed by a defendant").

The elements of unjust enrichment have been met. As demonstrated above, (1) a benefit was conferred on Beehive Telephone, *i.e.*, two TST charges for the use of Beehive Telephone's Wendover tandem were collected by Beehive Nevada and paid over to Beehive Telephone, (2) Beehive Telephone "appreciate[d] and ha[d] knowledge of the benefit," and (3) Beehive Telephone "accept[ed] and re[tained]" the benefit. That leaves whether Beehive Telephone's acceptance and retention of the TST charges were "under such circumstances as to make it inequitable" to do so. It plainly was because, as shown above, the TST charges were unlawful.

As in the cases of AT&T's demonstrations that Beehive Telephone is judicially estopped by what it had told the FCC and that Beehive Nevada acted as Beehive Telephone's agent, Beehive Telephone's Opposition Brief does not respond at all to AT&T's showing that Beehive Telephone is liable for the amounts billed and collected by Beehive Nevada under principles of

unjust enrichment.  By its silence, Beehive Telephone has conceded that this showing is correct and has waived any argument or contention that could be employed to oppose it.  See *Coffey v. Healthtrust,* 955 F.2d at 1393; see also *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d at 1325.

**VIII.   AT&T Did Not Release Any Part Of Its TST Overcharge Claim.**

Beehive Telephone asserts that a confidential settlement agreement and release entered into between Beehive Telephone and Beehive Nevada, on the one hand, and AT&T, on the other, in August 2007 (Beehive Opp. Ex. 8) releases two parts of AT&T's claim:  (i) the overcharges that were billed and collected in the first instance by Beehive Nevada, and (ii) the overcharges that were billed and collected for services rendered during the period February 21-March 31, 2006.

The settlement agreement on its face does not purport to settle or release *any* TST-related claims.  Just the contrary.  The agreement provides in the last "**WHEREAS**" clause:  "the Parties desire to avoid the necessity, expense, inconvenience and uncertainty of litigation or agency action to resolve and settle the TSF Claim *and any dispute between them, known or unknown, arising out of, or in any way related directly or indirectly to, the TSF Claim*. . . ."  (Beehive Opp. Ex. 8, at 4.)  (Emphasis added.)  Paragraph 1.3 states:  "The Parties have not agreed to settle AT&T's TST Claim."  *Id.*  Paragraph 1.4 states:  "The Settlement Agreement shall finally settle and resolve, all claims, known or unknown, which were asserted or which could have been asserted by AT&T and/or Beehive *arising out of or related directly or indirectly to the TSF Claim*. . . ."  *Id.* at 4-5 (emphasis added).  The parties settled and resolved only the TSF claim and disputes related to it; they expressly agreed they were not settling the TST claim.

35

Beehive Telephone relies on Paragraph 2.2 which purports to release any claim "related to the Dispute."  "Dispute," capital "D," is not a defined term.  But in view of the provisions quoted above, the only reasonable way to construe that word is as referring to the TSF dispute and only the TSF dispute.  Moreover, even if the undefined term could be deemed to have created an ambiguity, under controlling New York law (which Beehive Telephone agrees governs the settlement agreement – see Beehive Opp. Br. at 27), that ambiguity must be construed against the drafter – here Mr. Lukas acting on behalf of Beehive Telephone.[15]  *Frost v. Budget Car & Truck Rental,* 15 A.D.3d 963, 964, 788 N.Y.S.2d 904 (2005) ("it is well settled that any ambiguity should be resolved against the drafter of the release").

In any event, only claims are released, not theories of liability.  In September 2006 AT&T presented a *single* claim that it had been overcharged for TSTs because it was improperly charged for two TSTs at Beehive Telephone's intermediate tandem on calls handled by the Beehive Companies.  AT&T has put forward two theories of liability (agency and unjust enrichment) that show that Beehive is liable for the entire amount of the claim.  But those theories are not "claims."  A theory of liability is simply a theory under which the plaintiff can recover on its claim; it is not itself a claim.  *See Automatic Liquid Packaging, Inc. v. Dominik*, 852 F.2d 1036, 1037 (7th Cir. 1988) ("A theory is not a claim"); *Local P-171 v. Thompson Farms Co.*, 642 F.2d 1065, 1070-71 (7th Cir. 1981) ("mere variations of legal theory do not constitute separate claims").

Furthermore, "release" is an affirmative defense; it must be pled as such, or it is waived.

---

[15] Mr. Lukas prepared the initial draft.  See AT&T Reply Ex. A, BTC 1119-1127.  A few changes were made, but none to the provisions quoted above or to paragraph 2.2. They remained word for word as Mr. Lukas prepared them.  Compare AT&T Reply Ex. A and Beehive Opp. Ex. 8.

AT&T's original Complaint (filed December 5, 2008) (Dkt. No. 2) asserts that Beehive

Telephone is responsible and liable for the entire overcharge amount.  This includes of course

amounts that may have been billed in the first instance by Beehive Nevada.  Beehive Telephone

plainly knew that – as evidenced by the fact that it produced a stack of Beehive *Nevada* bills as

part of its initial disclosures.  See AT&T's Memorandum in Support of Its Motion for

Reconsideration (Dkt. No. 42), Exhibit 4.  If Beehive Telephone really believed that part of the

claim had been "released" (the part related to amounts billed in the first instance by Beehive

Nevada), Beehive Telephone was required to plead "release" as an affirmative defense.  It did

not.  Accordingly, the contention that part of the claim stated in the original complaint has been

"released" has been waived.  66 Am. Jur.2d Release 40 ("The failure to raise release as an

affirmative defense will result in a waiver of the defense."); *In re Cellular 101 Inc.,* 539 F.3d

1150, 1155 (9th Cir. 2008) ("Settlement and release is an affirmative defense and is generally

waived if not asserted in the answer to a complaint."); *National Compression Corp. v. Carrow,*

417 F.2d 97, 102 (8th Cir. 1969) ("Release is an affirmative defense. Rule 8(c), Fed.R.Civ.P.,

requires such defense to be pleaded."); *Reilly v. Beekman,* 24 F.2d 791, 795 (2nd Cir. 1928) ("It is

hardly necessary to say that a waiver or release must be affirmatively pleaded.")

## IX.    No Part Of AT&T's Claim Is Time-Barred.

AT&T's claim is one for recovery of overcharges.  Accordingly, 47 U.S.C. § 415(c)

provides the applicable statute of limitations.  Under this provision, if the claim is presented "in

writing" within the two-year limitations period provided for in § 415(a), and that claim is

subsequently denied, the two-year period is extended two years from the date of the denial.

Here, AT&T submitted its TST overcharge claim "in writing" on September 15, 2006 (AT&T

Ex. 13, BTC Dep. Ex. 8) and Beehive Telephone denied that claim on December 6, 2006.

AT&T Ex. 7.  Suit was filed within two years of this denial, on December 5, 2008.  (Dkt. No. 2).

Beehive Telephone has acknowledged that suit was timely filed on the claim presented on

September 15, 2006.

Beehive Telephone asserts, however, that (1) AT&T's "claim" that Beehive Telephone is

responsible and liable for the entire overcharge amount and (2) AT&T's contention that Beehive

Telephone is liable for overcharges billed for the period February 21-March 31, 2006 are barred

by the applicable statute of limitations.  The Court finds both assertions to be incorrect as a

matter of law.

As discussed above, the theories under which Beehive Telephone is responsible and

liable for the entire overcharge amount are not new "claims"; they are not *claims* at all.  The

claim that was presented in September 2006 (and denied on December 6, 2006) is still the claim

– and the only claim – that AT&T is pursuing.  Beehive has acknowledged that suit was filed on

that claim within the applicable limitations period.  To toll the running of the applicable statute

of limitations, a complaint must notify the defendant of the claim against it.  But it does not have

to specify the theory or theories under which the defendant is liable.[16]  Indeed, the plaintiff can

advance a theory for the first time at the summary judgment stage.[17]  It follows that an

overcharge plaintiff (like AT&T here) need not articulate its theories of liability when it presents

---

[16] *Misco Leasing, Inc. v. L.L. Keller*, 490 F.2d 545, 548 (10th Cir. 1974) (under Rule 8, "it is not necessary to allege the particular law or theory under which recovery is sought"); *Aaron v. Mahl*, 550 F.3d 659, 666 (7th Cir. 2008) ("a complaint need not contain legal theories"); *Coos County Board v. Kempthorne*, 531 F.3d 792, 812 n.16 (9th Cir. 2008) (the plaintiff is required to set forth in its complaint "claims for relief," not "statutes or legal theories"); *Evans v. McClaim of Georgia, Inc.*, 131 F.3d 957, 964 n.2 (11th Cir. 1997) ("A complaint need not specify in detail the precise theory giving rise to recovery.") (internal quotes and cite omitted).
[17] *O'Grady v. Vill. Of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002) (noting that although the plaintiff did not advance a particular theory until the summary judgment state, the complaint was adequate to put the defendant on notice).

its "claim" "in writing" under § 415(c).

Regarding the overcharges for the period February 21-March 31, 2006, the Court notes that the claim submitted on September 15, 2006 (as well as the Complaint filed on December 5, 2008), sought recovery of the overcharges billed under invoices dated August 1, 2004 through December 1, 2005.  From the Court's review of materials submitted by Beehive Telephone, it is readily apparent that AT&T used December 1, 2005 as the end date because AT&T understood that Beehive Telephone (and Beehive Nevada) had changed their TST billing practices effective November 21, 2005, and from that point forward were only charging for one TST per access minute, at their end offices.  Beehive Telephone and Beehive Nevada's discovery responses in this case make clear that in fact for the period November 21, 2005-February 20, 2006, they charged for TST only once, at the end office, per access minute.  See Undisputed Material Facts, ¶¶ 13 and fn. 6 and 14 and fn.7, *supra*.  In discovery responses submitted by the companies this last July, they disclosed that they resumed billing for two TSTs at the Beehive Telephone intermediate tandem for a brief period before their new, higher TST rate went into effect on April 1, 2006 – namely, the period February 21-March 31, 2006.  *Id.*  Based on this disclosure, AT&T sought recovery of these overcharges when it filed its motion for summary judgment in August.

The Court concludes that Beehive Telephone must have known that had AT&T been aware in the fall of 2006 that the Beehive Companies had reversed themselves and once again began billing for two TSTs at the Wendover, Utah intermediate tandem, AT&T would have included the February 21-March 31, 2006 overcharges in the claim it presented "in writing."  The materials relied upon by Beehive Telephone itself establish that.

39

On October 18, 2006, Linda Cross, who represented AT&T in connection with its disputes with the Beehive Companies, wrote to Debbi Waldbaum of AT&T and reported as follows:

> "The basic premise of the dispute is that Beehive has an intermediate tandem in Wendover UT in which they route their traffic . . . .  [T]his is an intermediate tandem and should not be used for the billing of switched access calls . . . .  [T]hey were billing three tandem switched terminations instead of the one they are allowed to bill . . . .  *They [Beehive] acknowledge that they applied the [TSTs] incorrectly and corrected the billing as of January 1st* . . . .  Beehive filed an interstate tariff tripling their [TST] rate in April '06 which became effective without contest and *instead of applying the new rate, they went back to billing the old rate three times*."

Beehive Opp. Ex. 6, p. 1 (emphasis added).

Beehive Telephone asserts that this should have "alerted" AT&T that the Beehive Companies went back to billing the two tandem-based TSTs *before* the new rate went into effect. But that is not what the e-mail says.  What it says is that the Beehive Companies went back to billing the old rate three times "instead of applying the new rate," which indicates that the Beehive Companies went back to billing the old rate three times only at a time when they had the legal ability to apply the new rate.  And they had that ability only after April 1, 2006.  (After the new rate went into effect, it did not make any significant difference whether Beehive billed the new rate or the old rate three times.)  Ms. Cross' October 18 e-mail therefore did not "alert" AT&T that Beehive had resumed overcharging during the period prior to April 1, 2006.

Mr. Lukas states in his declaration (Beehive Opp. Ex. 5, at 2-3) that on October 23, 2006, in an e-mail to Mr. Lukas, "Ms. Cross repeated what she had previously advised Ms. Waldbaum . . . ."  Thus, as of October 23, 2006, Mr. Lukas, and therefore the Beehive Companies, knew that Ms. Cross and AT&T had been misled, and did not tell them they were mistaken.

Under these circumstances, the overcharges for the period February 21-March 31, 2006

40

should be viewed as part of the claim that was presented in September 2006 (and denied on

December 6, 2006).  In the alternative, the statute of limitations should be equitably tolled until

July 2009, when the Beehive Companies disclosed the true facts.  *Communications Vending*

*Corp. of Arizona, Inc. v. FCC* 365 F.3d 1064, 1074-75 (D.C. Cir. 2004) (recognizing that 47

U.S.C. § 415 may be equitably tolled).  See also *American Telephone and Telegraph Co. v. Delta*

*Communications Corp.*, 114 F.R.D. 606, 612 (S.D. Miss. 1986) (citing decisions recognizing that

the statute of limitations of 47 U.S.C. 415 could be equitably tolled).

**X.   Because It Violated Its Tariff By Charging A Different Rate Than That Specified In The Tariff, Beehive Telephone Cannot Claim Refund Immunity Under 47 U.S.C. § 204(a)(3).**

      In both its Brief and its Opposition Brief, Beehive Telephone claims that it is immune

from refund liability by virtue of § 204(a)(3).  That argument fails because Beehive Telephone

violated its own tariff.  As demonstrated above, there was only one "termination" on the Beehive

Telephone and Beehive Nevada networks.  Accordingly, Beehive Tariff FCC No. 1 authorizes

the Beehive Companies to charge for TST only one time per access minute – because there was

only one "termination" per access minute.

      Beehive Telephone is "immunized" from refund liability under 47 U.S.C. § 204(a)(3)

only to the extent it charged the rate specified in its tariff.  That provision does not help Beehive

Telephone where, as here, it violated its "deemed lawful" tariff by charging a rate three times

that authorized by the tariff.  None of the authorities cited by Beehive Telephone are to the

contrary.  In fact, these authorities all support the proposition that because Beehive Telephone

has deviated from its tariff, it can and should be required to refund the TST overcharges.

      *Union Telephone Co. v. Qwest Corp.*, 495 F.3d at 1187 and *Cahnman v. Sprint Corp.*,

133 F.3d 484 (7th Cir. 1998) hold only that the filed rate doctrine is binding on both the customer

(here AT&T) and the carrier (here Beehive), which of course is precisely AT&T's point.  *Virgin Islands Telephone Corp. v. FCC*, 444 F.3d 666 (D.C. Cir. 2006), *ACS of Anchorage, Inc. v. FCC*, 290 F.3d 403 (D.C. Cir. 2002), and *Qwest Communications Corp. v. Farmers and Merchants Mutual Telephone Co.*, 22 FCC Rcd 17973, 17978 n. 52 (2007) all hold that a carrier in Beehive Telephone's position is immunized from refund liability when it charges the rate contained in its tariff.  Here, of course, Beehive Telephone (and Beehive Nevada) did not do that; instead, they deviated from the rate specified in its tariff and in fact charged three times that rate on the vast majority of the calls in issue.[18]

Beehive Telephone cites three additional cases in its Opposition Brief (at 2, n.7 and 36).  These cases also do not support its immunity contention.[19]

---

[18] Beehive asserts in its Brief at 13, n.9 that even if it violated its tariff, it is still "entitled to retain a 'reasonable amount' of its TST charges."  Beehive Telephone cites *Total Communications Services, Inc.*, 16 FCC Rcd 5726 (2001) as support for its assertion.  That case does not help Beehive Telephone.  In *Total* AT&T was charged a very high access rate by Total.  The FCC determined that Total was a complete sham, created by Atlas (a local exchange carrier) in an effort to obtain higher rates than those permitted by Atlas' tariff.  The FCC took Total out of the mix and ordered that Atlas could retain only the amounts authorized by *its* tariff.  Of course, that is precisely the relief AT&T seeks here:  the refund of all charges in excess of the lawful tariffed rate.

[19] *New Valley Corp. v. Pacific Bell*, 15 F.C.C.R. 5128 (2000) (Beehive Opp. at 2, n.7) and *AT&T Corp. v. Business Telecom*, 16 F.C.C.R. 12312 (2001) (*id.* at 36) are completely inapposite.  *New Valley* involved a service that was not covered by any tariff, so there was no filed rate; and *Business Telecom* involved a challenge to a filed, tariffed rate.  Here, the Beehive Companies' switched access service *is* covered by its tariff, which specifies all of the rules and rates that apply to each of its elements (including TST).  Under the filed rate doctrine, those rules and rates are binding on both AT&T *and the Beehive Companies*.  Moreover, AT&T isn't challenging the filed, tariffed rate; to the contrary, it is simply asking the Court to enforce it.  In *Theodore Allen Communications,* 12 F.C.C.R. 6623, MCI's tariff provided for two levels of volume discounts, one significantly larger than the other.  MCI gave Theodore Allen the smaller of the two; the Bureau found the tariff to be "ambiguous," and held that it must be construed against MCI.  As Beehive Telephone points out, because of the ambiguity the Bureau declined to find a clear violation of § 203(c) (which meant MCI was not subject to a penalty).  But at the same time, the Bureau found that by denying Theodore Allen the larger discount specified in the tariff, MCI was guilty of an "unjust and unreasonable" practice in violation of § 201(b).  12 F.C.C.R. at 6634.  Theodore Allen's damages for that violation were the difference between what it was charged and what it would have been charged had it received the larger discount.  Applied to this case, this means that even if the Beehive tariff were deemed "ambiguous," it must be construed against Beehive Telephone, which means that Beehive Telephone violated § 201(b) (see AT&T's Complaint, Count II) by charging AT&T for two tandem-based TSTs that were not permitted by the tariff.  If the reasoning of *Theodore Allen* were applied here, that would mean that AT&T is entitled to recover the two tandem-based TSTs as overcharges, which is precisely what it is seeking.

## CONCLUSION

Based on the foregoing and for other reasons set forth in plaintiff AT&T Corp.'s briefs and oral arguments, **IT IS HEREBY ORDERED**:

1.      AT&T Corp.'s Motion for Summary Judgment (Dkt. No. 34) is **GRANTED**;

2.      Beehive Telephone's Motion for Summary Judgment (Dkt. No. 38) is **DENIED**;

3.      AT&T Corp.'s Motion to Reconsider the Court's Denial of AT&T's Motion for Leave to Amend to Add Beehive Nevada (Dkt. No. 40) is denied as **MOOT**;

4.      A Judgment shall be entered for AT&T Corp. and against Beehive Telephone in the amount of $813,643.98, plus penalty interest thereon at the rate of .0292 percent, compounded daily, from the date AT&T Corp. presented its claim in writing, September 15, 2006, which amount through December 1, 2009 is $332,305.60, together with additional penalty interest at the same rate, compounded daily, until paid in full.

DATED this __26__ day of December, 2009.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

Approved as to form the foregoing Memorandum Opinion and Order on the Parties' Cross Motions for Summary Judgment and AT&T Corp.'s Motion for Reconsideration of the Court's Decision Denying Leave to Amend *AT&T Corp. v. Beehive Telephone Company, Inc.*, 2:08cv941:

Alan L. Smith

43

4838-5290-3941.1

David R. Irvine
*Attorneys for Beehive Telephone Company, Inc.*